1     or practice and <u>unfair, deceptive, untrue or</u>

2         <u>misleading advertising</u> and <u>any act</u>

3         <u>prohibited by Chapter 1 (commencing with Section 17500)</u>

4     of Part 3 of Division 7 of the Business and Professions Code"

5

6     **17500.**  "It is unlawful for any person, firm, corporation or

7     association, or any employee thereof with intent directly or

8     indirectly…or to perform services, professional or otherwise,

9     or anything of any nature whatsoever or to induce the public to enter

10    into any obligation relating thereto,

11    to make or disseminate or cause to be made or

12    disseminated before the public in this state, o<u>r</u> to make or

13    disseminate or cause to be made or disseminated from this state

14    before the public in any state, in any newspaper or other

15    publication, or any advertising device, or by public outcry or

16    proclamation, or in any other manner or means whatever, including

17    over the Internet, any statement, concerning…

18    or those services, professional or otherwise, or concerning

19    any circumstance or matter of fact connected with the proposed

20    performance or disposition thereof, which is untrue or misleading,

21    and which is known, or which by the exercise of reasonable care

22    should be known, to be untrue or misleading, or for any person, firm,

23    or corporation to so make or disseminate or cause to be so made or

24    disseminated any such statement as part of a plan or scheme with the

25    intent not to sell… or those services, professional or otherwise,

26    so advertised at the price stated therein,

27    or as so advertised."

28

1  **NBME/ECFMG could have published and announced the accurate description of**

2  **that their product /exam (which they did not), and that it is defective - not reliable,**

3  **has problems with subjectivity, consequence and contrast effects, and/or has**

4  **results in a disparate impact**.

5  **17531**.  *It is unlawful for any person, firm, or corporation, in any*

6  *...or any open publication, published, distributed, or circulated in this state,*

7  *including over the Internet, or on any billboard, card, label, or*

8  *other advertising medium, or by means of any other advertising device,*

9  *to advertise, call attention to or give publicity to the sale of any merchandise,*

10  *which merchandise is or which* **merchandise is defective in any manner**,

11  *unless there is conspicuously displayed directly in connection*

12  *with the name and description of that merchandise and*

13  *each specified article, unit, or part thereof,*

14  *a direct and unequivocal statement, phrase, or word*

15  *which will clearly indicate that the merchandise or each article,*

16  *unit, or part thereof so advertised is...,* **defective**, *as the case may be.*

17  *Any violation of this section is a misdemeanor..*

18  **17536**.  *Penalty for Violations of Chapter; Proceedings; Disposition*

19  *of Proceeds:(b) The court shall impose a civil penalty for each violation of*

20  *this chapter. In assessing the amount of the civil penalty, the court*

21  *shall consider any one or more of the relevant circumstances*

22  *presented by any of the parties to the case, including, but not*

23  *limited to, the following: the nature and seriousness of the*

24  *misconduct, the number of violations, the persistence of the*

25  *misconduct, the length of time over which the misconduct occurred,*

26  *the willfulness of the defendant's misconduct, and the defendant's*

27  *assets, liabilities, and net worth.*

28  **17202**.  *Notwithstanding Section 3369 of the Civil Code,*

1  *specific or preventive relief may be granted to enforce a penalty,*

2  *forfeiture, or penal law in a case of unfair competition.*

3  **17205**.  *Unless otherwise expressly provided, the remedies or*

4  *penalties provided by this chapter are cumulative to each other and*

5  *to the remedies or penalties available under all other laws of this*

6  *state.*

7  **17206**.  *Civil Penalty for Violation of Chapter*

8  *(b) The court shall impose a civil penalty for each violation of*

9  *this chapter. In assessing the amount of the civil penalty, the court*

10  *shall consider any one or more of the relevant circumstances*

11  *presented by any of the parties to the case, including, but not*

12  *limited to, the following: the nature and seriousness of the*

13  *misconduct, the **number of violations**, the **persistence of the***

14  ***misconduct, the length of time over which the misconduct occurred**,*

15  *the **willfulness of the defendant's misconduct**, and the defendant's*

16  *assets, liabilities, and net worth.*

17

18  V. <u>**CLAIM:  BREACH OF CONTRACT by NBME/ECFMG:**</u>

19  Civil Code, Section

20  **1549**.  *A contract is an agreement to do or not to do a certain*

21  *thing*

22  **1621**: "*An implied contract is one,*

23  *the existence and terms of which are manifested by conduct."*

24  **[3300.]**  *Section Thirty-three Hundred. "For the breach of an*

25  *obligation arising from contract, the measure of damages, except*

26  *where otherwise expressly provided by this Code,*

27  *is the amount which will compensate the party aggrieved for*

28  *all the detriment proximately caused thereby, or which, in the ordinary*

1  *course of things, would be likely to result therefrom."*

2  **3333**. *For the breach of an obligation not arising from contract,*

3  *the measure of damages, except where otherwise expressly provided by*

4  *this Code, is the amount which will compensate for all the detriment*

5  *proximately caused thereby, whether it could have been anticipated or*

6  *not.*

7  The likely thing to happen was employment, after passing Step 2 CS

8  and obtaining an **ECFMG-certification and PTAL**. An implied-in-fact

9  contract (A.K.A. "implied contract") is a contract agreed by non-verbal

10 conduct, rather than by explicit words. As defined by the United States

11 Supreme Court, it is "an agreement 'implied in fact'" as "founded upon a

12 meeting of minds, which, although not embodied in an express contract, is

13 inferred, as a fact, from conduct of the parties showing, in the light of the

14 surrounding circumstances, their tacit understanding."

15 NBME/ECFMG did not perform their part of the agreement, and with

16 respect to that:

17 **[3384.]** *Section Thirty-three Hundred and Eighty-four. Except as*

18 *otherwise provided in this Article, the specific performance of an*

19 *obligation may be compelled.*

20 **3386**. *Notwithstanding that the agreed counterperformance*

21 *is not or would not have been specifically enforceable,*

22 *specific performance may be compelled if:*

23 *(a) Specific performance would otherwise be an appropriate remedy;*

24 *and*

25 *(b) The agreed counterperformance has been*

26 *substantially performed or its concurrent or future performance*

27 *is assured or, if the court deems necessary,*

28 *can be secured to the satisfaction of the court.*

"The detriment that is 'likely to result therefrom' is that which is foreseeable to the breaching party at the time the contract is entered into." *(Wallis v.Farmers Group, Inc. (1990) 220 Cal.App.3d 718, 737 [269 Cal.Rptr. 299].*

Since recognizing my passing results would have resulted in obtaining an "ECFMG-certification" and obtaining a residency position, the NBME/ECFMG's intentional misconduct and breach of our agreement have **resulted in unemployment, and I have lost money, that I could have been making. In addition**, **since residency program directors consider the time spent for passing the exam, the number of attempts and the time since graduation, the damages to my career are significant and each year my chances to get into a residency program get smaller**.

"The basic object of damages is compensation, and in the law of contracts the theory is that the party injured by a breach should receive as nearly as possible the equivalent of the benefits of performance. The aim is to put the injured party in as good a position as he would have been had performance been rendered as promised." (*Brandon & Tibbs v. George Kevorkian Accountancy Corp. (1990) 226 Cal.App.3d 442, 455 [277 Cal.Rptr. 40].*

**3367.** *Specific relief is given:*

*2. By compelling a party himself to do that which ought to be done; or,*

**3368.** *Preventive relief is given by prohibiting a party from doing that which ought not to be done.*

## VI.   CLAIM: UNFAIR AND DECEPTIVE PRACTICE violation under 15 U.S. Code § 45 and California state laws.

*(a) Declaration of unlawfulness; power to prohibit unfair practices; inapplicability to foreign trade*

1       *(1) Unfair methods of competition in or affecting commerce,*

2       *and unfair or deceptive acts or practices in or affecting commerce,*

3       *are hereby declared unlawful.*

4       Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or

5 practices in or affecting commerce," and applies to all persons engaged in

6 commerce, including banks.

7 **Unfair Acts or Practices**

8 An act or practice is unfair where it

9 • Causes or is likely to cause substantial injury to

10 consumers,

11 • Cannot be reasonably avoided by consumers,

12 and

13 • Is not outweighed by countervailing benefits to

14 consumers or to competition.

15 Public policy, as established by statute, regulation,

16 or judicial decisions, may be considered with

17 all other evidence in determining whether an act or

18 practice is unfair.

19 **Deceptive Acts or Practices**

20 An act or practice is deceptive where

21 • A representation, omission, or practice misleads

22 or is likely to mislead the consumer;

23 • A consumer's interpretation of the representation,

24 omission, or practice is considered reasonable

25 under the circumstances; and

26 • The misleading representation, omission, or practice is material.

27 **Civil code Sections 17200,17205 and 17206** are the State law defining

28 specifically this type of practice.

## VII.   CLAIM: NBME and ECMFG, jointly and severally:

*Civil code Sections:* **1660** (cited earlier) and **1642.**

**1642**. *Several contracts relating to the same matters,*
*between the same parties, and made as parts of*
*substantially one transaction are to be taken together.*
*Code of Civil Procedure:* **379**. *(a) All persons may be joined*
*in one action as defendants*
*If there is asserted against them:*
*(1) Any right to relief jointly, severally, or in the alternative,*
*in respect of or arising out of the same transaction, occurrence, or*
*series of transactions or occurrences and*
*if any question of law or fact common to all these persons*
*will arise in the action; or*
*(2) A claim, right, or interest adverse to them in the property or*
*controversy which is the subject of the action.*
*(b) It is not necessary that each defendant be interested as to*
*every cause of action or as to all relief prayed for.*
*Judgment may be given against one or more defendants*
*according to their respective liabilities.*
*(c) Where the plaintiff is in doubt as to the person from whom he*
*or she is entitled to redress, he or she may join two or more*
*defendants, with the intent that the question as to which, if any, of*
*the defendants is liable, and to what extent, may be determined*
*between the parties.*

**Separately from these violations is the question about discrimination.**

## VIII.   CLAIM: DISCRIMINATION- related problem.

1    Whether there **is a "disparate impact involves "employment practices**

2    **that are facially neutral in their treatment of different groups but that**

3    **in fact fall more harshly on one group than another and cannot be**

4    **justified by business necessity…Proof of discriminatory motive, we**

5    **have held, is not required under a disparate-impact theory.",** is a

6    question of facts. Even if not intentional.

7    But it is also **possible that discriminatory problem is one of the**

8    **internal problems of the exam itself,** even if NBME/ECFMG did not have

9    to intention to discriminate.

10   However, the most important issue specifically in this case is not the

11   discriminatory question, **but the fact that I have passed each part of the**

12   **exam,** each component/subcomponent and NBME/ECFMG should

13   perform their part of the agreement and apply their applicable policy.

14   With all due respect, I would like to propose the Court to consider the

15   unique characteristics of each case, that make it different than the previous

16   ones, e.g. the cited cases by the Defendants' attorney. I am also

17   respectfully requesting the following facts be considered:

18   **1). The Steps and the USMLE is an employment-based/employment-**

19   **related test and business**. Because of this, it should be covered by all the

20   employment-related laws, and business-related laws, and many other laws

21   that have a relationship to NBME/ECFMG's activity (employment-related

22   and commerce-related). Such employment-related laws are 42 U.S.C

23   Section 2000e-2 (l) and 29 CFR §1607-tesitng and selection procedures,

24   used for employment decisions.

25   **2). The lawmaker has included words as "applicants and candidates**

26   **for employment",** as well as **"respondent"- including employment**

27   **agencies, labor organization, whose activities relate to employment.**

28

But even if there is no specific law that covers NBME/ECFMG' activity, then going back to the general discriminatory-related rules could be found useful here. Since all forms of discrimination are prohibited.

**3).** NBME/ECFMG also verifies the graduate's credentials and medical school diploma (ECMFG have contacted my medical school multiple times for verification), which is in addition to the administration of the test, **so that they act to "procure employees for an employer or to procure for employees opportunities to work for an employer…" -** the federal definition.

**NBME/ECFMG clearly acts and fulfill the federal law criteria/definition for an "employment agency".**  Wikipedia defines it: "An employment agency is an organization which matches employers to employees. In all developed countries, there is a publicly funded employment agency and multiple private businesses which act as employment agency", and business dictionary.com defines it: "Companies which attempt to match the employment needs of an employer with a worker having the required skill set and interests. Some agencies are privately owned while others are sponsored by government."
**NBME/ECMFG based on all these definitions is an "employment agency" for medical doctors, regardless of the name.**
The duck test – "If it looks like a duck, swims like a duck, and quacks like a duck, then it probably is a duck."

   **NBME also fulfill the special criteria for an "employer** means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks …".

**4) Only paragraph (a) of 45 U.S.C. 2000e-2 requires and clearly describes employer - "his employees or applicants" relationship.**

1  Further down, **in paragraph (l), "employer" is removed and replaced**
2  **with "respondent"** to include employment-related practices, not done by
3  the "employer" directly, "**in connection with the selection or referral of**
4  **applicants or candidates for employment"**. Medical school graduates
5  are applicants and candidates for employment, **NBME/ECFMG do refer**
6  **the applicants/candidates** who have passed to the residency programs
7  by giving the "ECFMG-certification" and sending the information directly to
8  the program directors confirming that the candidate is authorized to work as
9  a resident. **NBME/ECFMG "procure employees for an employer or to**
10 **procure for employees opportunities to work for an employer ..."**
11 NBME/ECFMG activity as an "employment agency" in the medical field.
12 **Then "to adjust scores, use different cut off scores for, or otherwise**
13 **alter the results of "employment related tests"** is also found here.
14 The EEOC guidelines, even if not binding, have their place and role.
15     5). **Discrimination has many forms, and as EEOC states "Because**
16 **direct evidence of discrimination is rare", e.g. in the form of a defect.**
17 The tort law states: "In general, a manufacturing or production defect is
18 readily identifiable because a defective product is one that differs from the
19 manufacturer's intended result or from other ostensibly identical units of the
20 same product line." (Barker v. Lull Engineering Co. (1978) 20 Cal.3d 413,
21 429 [143 Cal.Rptr. 225, 573 P.2d 443].)
22 "A defective product is viewed as one which fails to match the quality of
23 **most like products**, and the manufacturer is then liable for injuries
24 resulting from deviations from the norm ..." (Jiminez v. Sears, Roebuck &
25 Co. (1971) 4 Cal.3d 379, 383 [93 Cal.Rptr. 769, 482 P.2d 681].)
26 **Here, Step 1, Step 2 CK and Step 3 are the "most like products", "from**
27 **the same product line", that do not have such discriminatory effect,**
28

**are more objective unlike this exam, and are more reliable unlike this one.**

US and non- US classification word is a characteristic feature of the national origin, i.e.**"** individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group".

**6)**. In the Civil Rights Act 1991, "(a) RIGHT OF RECOVERY. - "(1) CIVIL RIGHTS. - In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-5) against a **respondent** who engaged in **unlawful intentional discrimination (<u>not an employment practice that is unlawful because of its disparate impact</u>**) prohibited under section 703, 704, or 717 of the Act (42 U.S.C. **2000e-2** or 2000e-3), and provided that the complaining party cannot recover under section 1977 of the Revised Statutes (42 U.S.C. 1981), the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent."

We see again the word "respondent", the "employer" definition is not only removed, but also in brackets the "employment practice due to disparate impact" is excluded, and the descriptions in Section 2000e-2 are called "unlawful intentional discrimination" without the employer/employee definition.

**7)**. The two of the three cases cited by the Defendants' attorney are from 1985 and 1979, before the changes were made in the above-cited law. The third one (Munsif v. Am. Bd. Of Internal Med.) is more complicated and also disgraceful/shameful case, in which he was unfairly stigmatized with mental

disease, when he was only fighting for his rights and career. After all, health, family, career are maybe the most important things in our lives these days. Having problems with one of them could have been very stressful to that person, and it would be for any of us.

I would like to note here that, **with all due respect, the judgment there was a matter of legal interpretation in the context of the case and its specific/unique factual characteristics.** For example, the decision could have been made based on the misuse of paragraph (a) of 45 U.S.C 2000e-2, the Plaintiff misused paragraph (a) "employer-his employees", instead of (l), which includes **employment-related** companies, it would be clear why the decision was not in his favor. Without seeing the documents filed and the exact paragraph the Plaintiff relied on, it is impossible to compare the cases and understand why the decision was not in his favor. Here, we have NBME/ECFMG's **practice "in connection with the selection or referral of applicants or candidates for employment**", and they fulfill the federal criteria included in "employment agency" description, in addition to "employer" description.

As it is a well-known fact that "**every case is different**", and **here we may have a problem with the exam itself that gives these discriminatory results, even if NBME/ECFMG did not intent to discriminate, i.e. defective product.**
**Also, we have false description, misrepresentation/deceit/fraud, breach of contract/agreement, unfair/deceptive practice. The rules governing the case are also different**. I would like to ask, respectfully, the Defendants' attorney to focus on our unique case which cannot be compared to other cases. Just because there is no law, that specifically uses "NBME/ECFMG" and addresses their practice and business", should not prevent justice.

1

2
## JUSTICE WITHOUT LAW

3
**Many years ago, Dean Roscoe Pound (Dean of Harvard Law School**

4
**from 1916 to 1936.),** in his book "Justice according to law", Chapter

5
"Justice without law" cited:

6
"All that the judge absolutely requires is authority to settle all disputes

7
which come before him. A tribunal altogether without law, though scarcely

8
within our experience, is not a contradiction." Markby, Elements of law.

9
"**Law is not essential element in the administration of justice. We**

10
**cannot have the former without the latter, but we may have the latter**

11
**without the former.**" Salmond, First Principles of Jurisprudence,89.

12

13
## RELIEF REQUESTED:

14

15
   This lawsuit resulted from the fact that I have passed each part of the

16
exam, and NBME/ECFMG false description of their product /service, and

17
violation of their own policy rules and breach of agreement/contract. Which

18
resulted in significant damages to me, due to their "arbitrary and capricious"

19
(without considering all the facts) irresponsible and negligent handling of

20
the case.

21
   **I am respectfully requesting the Court to help us solve this problem**

22
**and allows the case to proceed further, until this great unfairness is**

23
**eliminated and justice is served, and**

24

25
**1) denies the Defendants' Motion to dismiss, based on**

26
abovementioned claims, mainly based on the intentional/negligent

27
misrepresentation, false descriptions of the exam, deceit/fraud,

28
 and breach of contract/ agreement, and unfair and deceptive practice;

**2) if the Court feels that the case should proceed without considering the discrimination-related claim** (since it is a matter of interpretation of law and question of facts), pursuant to FRCP Rule. 54 (b), **to decide separately this specific claim**, or in the light of a defective exam (as part of this case);

**3) to compel the specific performance by the Defendants NBME/ECFMG, which they promised to do in our agreement/contract and which they never did.** The NBME/ECFMG's own policy rules **"Retakes" and "time-limit", were also violated by them;**

**4) to grant monetary damages (compensatory and punitive) for the consequences their misconduct caused to my career, since there already irreparable damages to my career.** We have passed the point, at which the problem could have been resolved, I could have obtained an **ECFMG-certification** and the California letter (**PTAL**), I could have started working as a resident (July 1st). Obviously, I was prevented from achieving all this by the NBME/ECFMG's wrongdoing.
**Contractual damages** are of two types—general damages (sometimes called direct damages) and special damages (sometimes called **consequential** damages)." (Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist. (2004) 34 Cal.4th 960, 968 [22 Cal.Rptr.3d 340, 102 P.3d 257].)
"Under contract principles, the **nonbreaching party is entitled to recover only those damages**, **including lost future profits**, which are 'proximately caused' by the specific breach. Or, to put it another way, the breaching party is only liable to place the nonbreaching party in the same position as if the specific breach had not occurred. Or, to phrase it still a

third way, the breaching party is only responsible to give the nonbreaching party the benefit of the bargain to the extent the specific breach deprived that party of its bargain." (Postal Instant Press v. Sealy (1996) 43 Cal.App.4th 1704, 1709 [51 Cal.Rptr.2d 365], internal citations omitted.)

**As NBME's attorney insist that they are separate organizations, implying separate liability, the damages be paid separately by NBME and ECFMG (in the minimum amount specified, which is the residency salary for three years)** due to their intentional misconduct and wrongdoing(tort), separately, lasting since 2015, and their refusal to resolve the problem they created. Thanks to their misconduct, I will be able to apply for the residency starting July 2017;

**5) if, in a very misfortunate case, the Court decides that I have to take the exam for a third time, I am respectfully asking the Court to order the Defendants to explain in writing to each residency program I apply to, about how I passed each part of the exam, but with months and months NBME/ECMFG prevented me from obtaining a residency position and I had to take again a subjective, unreliable, inefficient and defective product/exam.**

**I am also respectfully requesting the Court to order NBME/ECFMG to allow me to review my works and evaluations, so that I know where and what mistakes I made (As in the "Richardson" case, cited in my initial Complaint) and the checklist filled out by the patients, so that I will know what exactly skills I need to show in CIS, ICE and SEP parts (although I have already shown skills and passed all these parts).**

06/27/2016                                      Respectfully submitted:

California                          ------~~~~~------, Pro se

June 28th                                    YOANA Kiprilov

# Development and Initial Validation of a Program Director's Evaluation Form for Medical School Graduates

*Ting Dong, PhD\*; Steven J. Durning, MD, PhD\*; COL William R. Gilliland, MC USA (Ret.)†;
Kimberly A. Swygert, PhD‡; CDR Anthony R. Artino Jr., MSC USN\**

**ABSTRACT**    Background: In the early 1990s, our group of interdepartmental academicians at the Uniformed Services University (USU) developed a PGY-1 (postgraduate year 1) program director evaluation form. Recently, we have revised it to better align with the core competencies established by the Accreditation Council for Graduate Medical Education. We also included items that reflected USU's military-unique context. Purpose: To collect feasibility, reliability, and validity evidence for our revised survey. Method: We collected PGY-1 data from program directors (PD) who oversee the training of military medical trainees. The cohort of the present study consisted of USU students graduating in 2010 and 2011. We performed exploratory factor analysis (EFA) to examine the factorial validity of the survey scores and subjected each of the factors identified in the EFA to an internal consistency reliability analysis. We then performed correlation analysis to examine the relationship between PD ratings and students' medical school grade point averages (GPAs) and performance on U.S. Medical Licensing Examinations Step assessments. Results: Five factors emerged from the EFA—Medical Expertise, Military-unique Practice, Professionalism, System-based Practice, and Communication and Interpersonal Skills." The evaluation form also showed good reliability and feasibility. All five factors were more strongly associated with students' GPA in the initial clerkship year than the first 2 years. Further, these factors showed stronger correlations with students' performance on Step 3 than other Step Examinations. Conclusions: The revised PD evaluation form seemed to be a valid and reliable tool to gauge medical graduates' first-year internship performance.

## INTRODUCTION

Medical educators are responsible for training competent physicians. This responsibility is not simply a goal; it is a fundamental obligation to society. To help fulfill this obligation, medical educators need to develop reliable and valid assessment measurements that evaluate domains of competence across the spectrum of medical education.

Medical educators currently lack diverse, reliable, and valid measures to assess trainees at the transition between undergraduate and graduate medical education (GME).[1] This gap is due, in part, to the fact that undergraduate medical education assessment tools typically differ from GME assessment tools. Furthermore, from a feasibility standpoint, it is difficult to track graduates across the wide spectrum of residency programs offered in the United States.

Another potential reason for this gap in assessment measures is that medical schools and GME programs use different evaluation frameworks. In GME, the emphasis of evaluation frameworks is on competencies including patient care, medical knowledge, professionalism, communication and interpersonal skills, systems-based practice, and practice-based learning and improvement. These competencies are used in

multiple GME settings and evidence to support their reliability and validity has been gathered previously.[2] Medical schools, until recently, have not adapted competencies from the Accreditation Council for Graduate Medical Education (ACGME) or other sources into their evaluation frameworks.

In the early 1990s, our group of interdepartmental academicians at the Uniformed Services University of the Health Sciences (USU) developed a program director evaluation form. In a prior study composed of 1,247 forms from eight specialties with a response rate of 80%, an 18-item "postgraduate year 1" (PGY-1) survey demonstrated reliability (high internal consistency) and validity, with the items organized into a two-factor structure: "Expertise and Professionalism."[3] In this study, Expertise displayed a modest correlation with students' medical school grade point average (GPA), U.S. Medical Licensing Examination (USMLE) Step 1 and Step 2 clinical knowledge (CK).

We recently revised this program director (PD) evaluation form to better align the items with the competencies established by the ACGME. In this revised form, we also included items that reflected USU's military-unique context. Therefore, the purpose of the present study was to collect feasibility, reliability, and validity evidence for our revised survey. For the investigation of validity, we included students' performance on all USMLE Step assessments and their medical school GPAs. We hypothesized that PD evaluations would correlate more strongly with clinical GPA than preclinical GPA and show a stronger association with Step 2 Clinical Skill (CS) and Step 3 than Step 1 or Step 2 CK. The reason is that PD evaluations are mainly based on interns' clinical performance and are more proximate in time with clerkship GPA and Step 2 CS and Step 3.

---

\*Department of Medicine, Uniformed Services University of the Health Sciences, 4301 Jones Bridge Road, Bethesda, MD 20814.

†F. Edward Hébert School of Medicine, Uniformed Services University of the Health Sciences, 4301 Jones Bridge Road, Bethesda, MD 20814.

‡National Board of Medical Examiners, 3750 Market Street, Philadelphia, PA 19104.

The views expressed in this article are those of the authors and do not necessarily reflect the official policy or position of the Department of Defense or the U.S. Government.

doi: 10.7205/MILMED-D-14-00551

-39-



Downloaded from publications.amsus.org: AMSUS - Association of Military Surgeons of the U.S. IP: 173.058.128.221 on Jun 12, 2016.
Copyright (c) Association of Military Surgeons of the U.S. All rights reserved.

*Development and Initial Validation of a Program Director's Evaluation Form*

## METHOD

### Study Context

This study was part of the larger Long-Term Career Outcome Study conducted at the F. Edward Hébert School of Medicine, USU. As the United States' only federal medical school, USU matriculates approximately 170 medical students annually and, at the time of this study, offered a traditional 4-year curriculum: 2 years of basic science courses followed by 2 years of clinical rotations (clerkships).

### Item Development

The PGY-1 survey developed in the present study was based on the 2005 survey and took into account the core competencies defined by the ACGME: (1) patient care, (2) medical and population health knowledge, (3) interpersonal and communication skills, (4) practice-based learning and improvement, (5) professionalism, and (6) systems-based practice (see Appendix).[4] The survey included 58 items organized into six sections: Patient Care, Communication and Interpersonal Skills, Medical Knowledge, Professionalism, System-based Practice, and Military-unique Practice. The last two items were general ratings of "overall clinical competence" and whether "I would trust this trainee to care for me or a close family member." These two items were excluded from subsequent exploratory factor analysis. The remainder of the 56 items are listed in Table I.

### Participants and Procedures

We collect PGY-1 data annually from program directors who oversee the training of military medical trainees. Each spring we identified military treatment facilities (and some non-military training programs) where our interns and residents are trained, and we mailed the evaluation forms for each trainee to the respective GME PDs. We asked GME directors to distribute the forms to their PDs and then return the completed forms in envelopes or via emailed attachment. Forms we received were recorded upon receipt. The cohort of the present study consisted of USU students graduating in 2010 and 2011.

### Measures and Statistical Analyses

First we conducted an exploratory factor analysis (EFA) to examine the factorial validity of the survey scores. Next, we subjected each of the factors identified in the EFA to an internal consistency reliability analysis and computed a mean score for the items associated with a particular factor (i.e., the variables were unweighted composite scores). Finally, to investigate the construct validity of the survey scores, we performed correlation analysis to examine the relationship between PD ratings and students' medical school GPAs, including preclinical GPA, initial clerkship year GPA, and cumulative GPA. We also examined the correlations between PD ratings and student's performance on USMLE Step assessments. Statistical significance was set at $p < 0.01$ because of the number of correlation coefficients being calculated. Preclinical GPA was calculated using course grades from the first 2 years of medical school. Initial clerkship year GPA is a composite of students' clerkship clinical points (a weighted summation of a student's clinical grade recommendations), objectively structured clinical examination scores, and National Board Medical Examiner Subject Examination scores. Cumulative GPA refers to the GPA calculated based on the entire 4 years of medical school study. All GPAs were on a common 4-point scale.

The USMLE is a single program consisting of four separate examinations designed to assess an examinee's understanding of and ability to apply concepts and principles that are important in health, disease, and effective patient care. We obtained study participants' USMLE Step 1 and Step 2 CK scores from USU's Registrar's Office, and Step 2 CS and Step 3 scores from the National Board of Medical Examiners. Step 2 CS is a standardized patient-based clinical skills assessment with a set of three conjunctive outcomes: Integrated Clinical Encounter (ICE), Communication and Interpersonal Skills (CIS), and Spoken English Proficiency (SEP). Because the spoken English proficiency component shows little meaningful variability for native English speakers, as medical students in the United States overwhelmingly tend to be, the present study focused only on the ICE and CIS components.

All analyses were completed using SPSS 22.0 (IBM Corporation, New York, NY), and the study was approved USU Institutional Review Board.

## RESULTS

### Exploratory Factor Analysis

We had 293 surveys returned. The response rate was 86.2% (293/340). We conducted a principal axis factor analysis with oblique rotation (Direct Oblimin). Evaluation of the correlation matrix indicated that it was factorable: Kaiser–Meyer–Olkin Measure of Sampling Adequacy was 0.95, which is "marvelous" (>0.90) according to Kaiser's criteria.[5] Bartlett's test of sphericity ($\chi^2 = 18521.47$, df = 1540, $p < 0.001$) was significant, indicating that the correlation matrix was not an identity matrix, and all measures of sampling adequacy were deemed sufficient (i.e., >0.60).[5]

We determined the number of factors to extract using several criteria, including parallel analysis, examination of the resulting scree plot, and eigenvalues greater than 1.0.[6] All three criteria suggested a five-factor solution, with the five factors accounting for 87.0% of the total variance in the items. Inspection of the table of communalities revealed all the items had high extracted communalities (i.e., >0.40; see Table I), indicating that much of the common variance in the items can be explained by the five extracted factors.[5]

We used several additional rules to determine the number of factors and individual items to retain in the final solution: (1) factors needed to contain at least three items, (2) the

98

−40−

Downloaded from publications.amsus.org: AMSUS - Association of Military Surgeons of the U.S. IP: 173.058.128.221 on Jun 12, 2016.
Copyright (c) Association of Military Surgeons of the U.S. All rights reserved.

# Longitudinal Effects of Medical Students' Communication Skills on Future Performance

*Ting Dong, PhD\*; Lt Col (Sel) Jeffrey S. LaRochelle, USAF MC\*; Steven J. Durning, MD, PhD\*;
LTC Aaron Saguil, MC USA†; Kimberly Swygert, PhD‡; CDR Anthony R. Artino Jr., MSC USN\**

**ABSTRACT**   Background: The Essential Elements of Communication (EEC) were developed from the Kalamazoo consensus statement on physician–patient communication. The Uniformed Services University of the Health Sciences (USU) has adopted a longitudinal curriculum to use the EEC both as a learning tool during standardized patient encounters and as an evaluation tool culminating with the end of preclerkship objective-structured clinical examinations (OSCE). Medical educators have recently emphasized the importance of teaching communication skills, as evidenced by the United States Medical Licensing Examination testing both the integrated clinical encounter (ICE) and communication and interpersonal skills (CIS) within the Step 2 Clinical Skills exam (CS). Purpose: To determine the associations between students' EEC OSCE performance at the end of the preclerkship period with later communication skills assessment and evaluation outcomes in the context of a longitudinal curriculum spanning both undergraduate medical education and graduate medical education. Methods: Retrospective data from preclerkship (overall OSCE scores and EEC OSCE scores) and clerkship outcomes (internal medicine [IM] clinical points and average clerkship National Board of Medical Examiners [NBME] scores) were collected from 167 USU medical students from the class of 2011 and compared to individual scores on the CIS and ICE components of Step 2 CS, as well as to the communication skills component of the program directors' evaluation of trainees during their postgraduate year 1 (PGY-1) residency. In addition to bivariate Pearson correlation analysis, we conducted multiple linear regression analysis to examine the predictive power of the EEC score beyond the IM clerkship clinical points and the average NBME Subject Exams score on the outcome measures. Results: The EEC score was a significant predictor of the CIS score and the PGY-1 communication skills score. Beyond the average NBME Subject Exams score and the IM clerkship clinical points, the EEC score explained an additional 13% of the variance in the Step 2 CIS score and an additional 6% of the variance in the PGY-1 communication skills score. In addition, the EEC score was more closely associated with the CIS score than the ICE score. Conclusion: The use of a standardized approach with a communication tool like the EEC can help explain future performance in communication skills independent of other education outcomes. In the context of a longitudinal curriculum, this information may better inform medical educators on learners' communication capabilities and more accurately direct future remediation efforts.

## INTRODUCTION

The importance of teaching, assessing, and improving the communication skills of physicians-in-training cannot be over-emphasized—physicians must be competent communicators to effectively practice medicine.[1] The Accreditation Council for Graduate Medical Education (ACGME) and the American Board of Medical Specialties (ABMS) have jointly identified communication and interpersonal skills (CIS) as one of the six general competencies for physicians.[2,3] The Institute of Medicine also specifies communication skills as one of the six essential curricular domains for effective patient care.[4] Postgraduate accredited training programs are required to demonstrate that they teach and evaluate trainees' communication

*Department of Medicine, Uniformed Services University of the Health Sciences, 4301 Jones Bridge Road, Bethesda, MD 20814.

†Department of Family Medicine, Uniformed Services University of the Health Sciences, 4301 Jones Bridge Road, Bethesda, MD 20814.

‡National Board of Medical Examiners, 3750 Market Street, Philadelphia, PA 19104.

The views expressed in this article are those of the authors and do not necessarily reflect the official policy or position of the Department of Defense or the U.S. Government.

doi: 10.7205/MILMED-D-14-00565

skills. The importance of communication skills is also demonstrated in licensing examinations. The U.S. Medical Licensing Examination requires students to take a clinical skills examination with standardized patients as part of Step 2,[5] the Step 2 Clinical Skills (CS) assessment; this has a separate subcomponent and passing standard for the evaluation of CIS.

The development and administration of CIS assessment tools is challenging and resource intensive. It is difficult to assess communication skills through inauthentic means (such as a written test), as it requires in vivo demonstration.[1] Competence in communication skills is not only about the presence of specific behaviors but also about the timing of effective verbal and nonverbal behaviors in the context of interactions with patients.[6] In 1999, leaders and representatives from medical schools, residency programs, continuing medical education providers, and prominent medical educational organizations in North America gathered in Kalamazoo for the purpose of identifying and specifically articulating ways to facilitate the teaching and evaluation of physician–patient communication.[7] After examining 5 models of physician–patient communication that had been used by the conference attendees, the group reached a consensus on a set of Essential Elements of Communication (EEC).

Downloaded from publications.amsus.org: AMSUS - Association of Military Surgeons of the U.S. IP: 173.058.128.221 on Jun 10, 2016.
Copyright (c) Association of Military Surgeons of the U.S. All rights reserved.

From the standpoint of learning communication skills, many research studies have shown that these skills can be taught.[8,9] Yedidia et al[9] found that communications curricula significantly improved third-year medical students' "overall communications competence as well as their skills in relationship building, organization and time management, patient assessment, and negotiation and shared decision-making." Aspegren[8] also pointed out that those students with the lowest pre-training scores benefit the most from communication skills curriculum and that the best time to learn these skills in medical school is most likely during clinical clerkships.

At the Uniformed Services University of the Health Sciences (USU), we have adopted a longitudinal curriculum using the EEC (see the Appendix) as both a learning tool during standardized patient encounters and as an evaluation tool culminating with the end of preclerkship objective-structured clinical examination (OSCE). Students are provided with a copy of the EEC on their second day of medical school and immediately begin developing skills related to the first two domains (opening the discussion and building the relationship). Students build upon their communication skills through standardized patient interactions, real patient interviews, and small-group discussions, using the domains of the EEC as a guide. The EEC then becomes the primary assessment tool for communication skills during standardized and real patient encounters over the course of the preclerkship training period.

The purpose of this study was to determine the associations between students' EEC OSCE performance during the preclerkship period with later communication skills assessment and evaluation outcomes in the context of a longitudinal curriculum spanning both undergraduate medical education (UME) and graduate medical education (GME). The outcomes were the CIS and integrated clinical encounter (ICE) scores of Step 2 CS, as well as the communication skills component of the program directors (PDs) evaluation of trainees' during their postgraduate year 1 (PGY-1) residency. If poor performance can be diagnosed as early as the end of the preclerkship period by EEC assessment, this would better inform medical educators on learner ability, and more accurately direct remediation efforts. The research hypotheses were (1) students' EEC score would explain a significant amount of variance in the Step 2 CS CIS score and the PGY-1 communication skills score, beyond the variance explained by other established clerkship performance measures, and (2) the associations between EEC score and Step 2 CS ICE score would be weaker compared with those between EEC score and CIS score since both EEC and CIS scores are measures of students' communication skills.

## METHODS

### Study Context and Participants

This investigation was part of the larger Long-Term Career Outcome Study conducted at the F. Edward Hébert School of Medicine, USU. As the United States' only federal medical school, USU matriculates approximately 170 medical students annually and, at the time of this study, offered a traditional 4-year curriculum: 2 years of basic science courses followed by 2 years of clinical rotations (clerkships). The participants of the present study were students graduating in 2011 ($N = 167$; 58 were female [34.7%] and 109 were male [65.3%]).

## Measures

### EEC Score

The EEC score on the OSCE consists of seven domains (open the discussion, build the relationship, gather information, understand the patient perspective, share information, reach agreement, and provide closure), in addition to an overall global rating. Each domain has a 5-point Likert-type scale associated with behavioral anchors. Standardized patients are trained on how to use the EEC assessment tool and complete their evaluations after each encounter with a student. The overall score on each OSCE station is converted into a percentage of available points, and the average across all OSCE stations is recorded as the final EEC score on the OSCE.

According to a previously conducted but unpublished generalizability study at the USU, the second-year OSCE stations demonstrated a moderate generalizability coefficient ($r = 0.52$), with 18.1% and 3.7% of the overall variance explained by the OSCE station and rater, respectively. Overall, 40.8% of the total variance was explained by student ability. These generalizability values are slightly lower than the published reliabilities for the Step 2 CS components of CIS, data gathering, and patient note, but are in line with other school-level OSCE reliabilities.[10] The EEC reliability estimate is higher, as a study by Joyce et al found the internal reliability coefficient (Cronbach's $\alpha$) of standardized patient EEC scores to be 0.90.[11]

### Average NBME Subject Exams Score

The third-year curriculum consisted of the school's core clerkship rotations: family medicine, internal medicine (IM), general surgery, psychiatry, pediatrics, and obstetrics and gynecology. All core clerkship rotations use the relevant NBME Subject Exam, which is given near the end of the core rotation. The average NBME Subject Exam score was the un-weighted mean of the scores across the clerkships. Nationally, the mean scores (2009–2010) ranged from 73.1 (SD = 8.9) in general surgery through 78.2 (SD = 8.8) in psychiatry.

### IM Clerkship Clinical Points

During the student's IM clerkship, teachers recommended grades for each student, and reported the number of clinics spent with each student. Teacher-recommended grades were weighted according to the number of clinics the teacher spent with the students and summarized into a measure called clinical points.

Downloaded from publications.amsus.org: AMSUS - Association of Military Surgeons of the U.S. IP: 173.058.128.221 on Jun 10, 2016.
Copyright (c) Association of Military Surgeons of the U.S. All rights reserved.

Moderator: Larry Gruppen, PhD
Discussant: Brad Rosen, MD

# A Multilevel Analysis of Examinee Gender, Standardized Patient Gender, and United States Medical Licensing Examination Step 2 Clinical Skills Communication and Interpersonal Skills Scores

Monica M. Cuddy, Kimberly A. Swygert, David B. Swanson, and Ann C. Jobe

## Abstract

**Background**
Women typically demonstrate stronger communication skills on performance-based assessments using human raters in medical education settings. This study examines the effects of examinee and rater gender on communication and interpersonal skills (CIS) scores from the performance-based component of the United States Medical Licensing Examination, the Step 2 Clinical Skills (CS) examination.

**Method**
Data included demographic and performance information for examinees that took Step 2 CS for the first time in 2009. The sample contained 27,910 examinees, 625 standardized patient/case combinations, and 278,776 scored patient encounters. Hierarchical linear modeling techniques were employed with CIS scores as the outcome measure.

**Results**
Females tend to slightly outperform males on CIS, when other variables related to performance are taken into account. No evidence of an examinee and rater gender interaction effect was found.

**Conclusions**
Results provide validity evidence supporting the interpretation and use of Step 2 CS CIS scores.

**S**trong communication skills aid physicians in successful patient care. Indeed, with strong communication skills, physicians identify patients' health problems more accurately.[1] Furthermore, when physicians are effective communicators, patients adhere to treatment plans and lifestyle recommendations more often.[2] Patient satisfaction is also greater when effective communication between patients and physicians exists.[1]

Studies suggest that communication skills differ by physician gender in medical education settings, where women typically outperform men on performance-based assessments using human raters.[3–10] Moreover, research shows no consistent evidence of serious physician and rater gender interaction effects on communication scores: The congruence or discordance of physician and rater gender does not seem to impact performance.[5–7,9,10]

Correspondence: Monica M. Cuddy, MA, 3750 Market Street, Philadelphia, PA 19104; e-mail: mcuddy@nbme.org.

Acad Med. 2011;86:S17–S20.
doi: 10.1097/ACM.0b013e31822a6c05

The present study extends past research by examining the effects of examinee and rater gender on communication scores from the performance-based assessment included in the United States Medical Licensing Examination (USMLE). It examines (1) the relationship between examinee gender and USMLE communication scores and (2) whether rater gender influences the relationship between examinee gender and USMLE communication scores.

## Method

The USMLE includes a performance-based assessment (Step 2 Clinical Skills [CS]) during which examinees complete 12 stations, each resembling a patient encounter in an ambulatory setting. For each encounter, examinees interact with a standardized patient (SP) trained to portray a real patient. Examinees see balanced examination forms with approximately equal numbers of male and female SPs.

SPs evaluate examinee performance in three main areas: communication and interpersonal skills (CIS), data gathering (DG), and spoken English proficiency (SEP). CIS, the focus of this research, includes three subcomponents:

questioning skills, information-sharing skills, and professional manner and rapport, each of which is rated by SPs using a nine-point holistic rating scale. Results are summed to obtain an overall CIS score. DG assesses the ability to take a history and perform a physical examination using a percentage-of-possible-points scale, and SEP assesses the clarity of spoken English using a nine-point holistic rating scale. The ratings for CIS and DG are calibrated prior to scoring to adjust for the effects of SP stringency and case difficulty. SEP ratings are not calibrated. SP stringency refers to the degree to which SPs are lenient or severe in their evaluations, and case difficulty refers to the overall degree of challenge associated with the content of a case.

SPs must complete intensive training to learn to use the CIS scale, during which they must pass a standardized assessment, and are evaluated in unscored encounters in the live examination before officially being certified to enter it. Overall, 97% of SPs in the live examination perform without error or with minor errors unrelated to scoring. The small percentage of SPs committing serious errors are retrained

43

Copyright © by the Association of American Medical Colleges. Unauthorized reproduction of this article is prohibited.

T3

## Table 2
**Results of Encounters-Nested-in-SP/Case Combinations HLM Analyses**

| Random-effects ANOVA | | | | | |
|---|---|---|---|---|---|
| **Fixed effect** | **Regression coefficient** | **Standard error** | **t ratio** | **df** | **P value** |
| Intercept | 19.56 | 0.01 | 3580.14 | 624 | .00 |
| **Random effect** | **Standard deviation** | **Variance component** | **df** | **Chi-square** | **P value** |
| Intercept | 0.08 | 0.01 | 624 | 1086.17 | .00 |
| Within SP/case | 2.11 | 4.45 | N/A | N/A | N/A |
| **Final random-coefficients model** | | | | | |
| **Fixed effect** | **Regression coefficient** | **Standard error** | **t ratio** | **df** | **P value** |
| Intercept | 19.57 | 0.01 | 2258.24 | 624 | .00 |
| Examinee gender | 0.23 | 0.02 | 13.93 | 624 | .00 |
| IMG status | −0.46 | 0.01 | −49.79 | 278768 | .00 |
| Examinee age | 0.004 | 0.00 | 4.19 | 278768 | .00 |
| Step 2 CK scores | 0.01 | 0.00 | 44.892 | 278768 | .00 |
| Step 2 CS SEP scores | 0.50 | 0.00 | 121.93 | 278768 | .00 |
| Step 2 CS DG scores | 0.04 | 0.00 | 121.69 | 278768 | .00 |
| **Random effect** | **Standard deviation** | **Variance component** | **df** | **Chi-square** | **P value** |
| Intercept | 0.19 | 0.04 | 623 | 3387.98 | .00 |
| Examinee gender | 0.36 | 0.13 | 623 | 2969.08 | .00 |
| Within SP/case | 1.88 | 3.54 | N/A | N/A | N/A |
| **Final intercepts-and-slopes-as-outcomes model (selected results)** | | | | | |
| **Fixed effect** | **Regression coefficient** | **Standard error** | **t ratio** | **df** | **P value** |
| Examinee gender | 0.23 | 0.02 | 14.18 | 623 | .00 |
| SP age | −0.003 | 0.00 | −3.56 | 623 | .02 |
| **Random effect** | **Standard deviation** | **Variance component** | **df** | **Chi-square** | **P value** |
| Intercept | 0.19 | 0.04 | 623 | 3388.36 | .00 |
| Examinee gender | 0.35 | 0.13 | 622 | 2908.07 | .00 |
| Within SP/case | 1.88 | 3.54 | N/A | N/A | N/A |

predictor of the relationship between examinee gender and CIS scores. SP age was not significantly related to average CIS scores. All other between-SP/case predictors were not significantly related to the intercept or the examinee gender coefficient and were removed.

The lower portion of Table 2 presents selected results of the final intercepts-and-slopes-as-outcomes model. The within-SP/case regression coefficients were consistent with the results of the final random-coefficients model in terms of significance, direction, and magnitude and were excluded from the lower portion of Table 2. Results indicated that SP age affected the relationship between examinee gender and CIS scores. As SP age increases, the degree to which women

outperformed men on CIS decreases, indicating that the gender-related score gap closes for older SPs. More specifically, for every 10-year increase in SP age, the examinee gender coefficient decreases by 0.03.

## Discussion

The current study shows that females outperform males slightly on the CIS component of USMLE Step 2 CS when other variables related to examinee performance are taken into account. This is consistent with past research in medical education and medical practice where female physicians engage in more patient-centered communication than male physicians.[12] As such, the results of this study may indicate that the small,

gender-related difference in CIS scores is a function of differing proficiencies and not a function of bias in the examination. Female physicians may be socialized in ways that produce somewhat stronger communication and interpersonal skills compared with male physicians. Depending on such factors as examination stakes, the magnitude of the gender-related score gap in communication skills may vary within medical education settings. It may also differ in medical practice compared with medical education settings.

When human raters assess communication skills, the potential for bias exists because rater characteristics not intended to influence ratings may add systematic error to scores. Of

-44-

Copyright © by the Association of American Medical Colleges. Unauthorized reproduction of this article is prohibited.

# Assessing the Impact of Modifications to the Documentation Component's Scoring Rubric and Rater Training on USMLE Integrated Clinical Encounter Scores

Su G. Baldwin, Polina Harik, Lisa A. Keller, Brian E. Clauser, Peter Baldwin, and Thomas A. Rebbecchi

## Abstract

**Background**
Documentation is a subcomponent of the Step 2 Clinical Skills Examination Integrated Clinical Encounter (ICE) component wherein licensed physicians rate examinees on their ability to communicate the findings of the patient encounter, diagnostic impression, and initial patient work-up. The main purpose of this research was to examine the impact of modifications to the scoring rubric and rater training protocol on the psychometric characteristics of the documentation scores.

**Method**
Following the modifications, the variance structure of the ICE components was modeled using multivariate generalizability theory.

**Results**
The results confirmed the expectations that true score variance for the documentation subcomponent would increase after adopting a modified training protocol and increased rubric specificity.

**Conclusions**
In general, results support the commonsense assumption that providing raters with detailed rubrics and comprehensive training will indeed improve measurement outcomes. Although the steps taken here were in the right direction, there remains room for improvement. Efforts are currently under way to further improve both the scoring rubrics and rater training.

Acad Med. 2009;84(10 Suppl):S97–S100.

Performance assessment literature is in agreement that human ratings are often contaminated by construct-irrelevant variance.[1] It is the responsibility of testing agencies to minimize such effects by ensuring that raters behave in a standardized manner that yields consistent and meaningful scores. A successful strategy for meeting this responsibility will include building well-designed, detailed scoring rubrics and providing rigorous training to all raters.

Of course, good intentions do not guarantee success. No agency deliberately builds poorly designed rubrics or intentionally provides inadequate training; nevertheless, these unfortunate outcomes are not uncommon. Thus, validity evidence must be collected to support the adequacy of rubrics and the efficacy of training protocols. The Standards for Educational and

Correspondence: Su G. Baldwin, EdD, National Board of Medical Examiners, 3750 Market Street, Philadelphia, PA, 19104; e-mail: (sbaldwin@nbme.org).

Psychological Testing define the process of validation as "accumulating evidence to provide a sound scientific basis for the proposed score interpretations. . . . Validation can be viewed as developing a scientifically sound validity argument to support the intended interpretation of test scores and their relevance to the proposed use."[2] This view is consistent with Kane's[3] well-known conceptualization of validity. He suggests a framework in which the validity argument can be viewed as containing four types of evidence which logically link the data collected for the assessment with the proposed interpretations: scoring, generalization, extrapolation, and decision or interpretation. The current study presents validity evidence for the documentation scores from the United States Medical Licensing Examination (USMLE) Step 2 Clinical Skills Examination. The documentation component, also known as the *patient note*, requires examinees to document their findings in a structured format after each patient encounter. The validity evidence presented here is related to two of Kane's four categories: (1) *scoring*

evidence related to the elements of the performance the raters score and the relationship between the scoring rubric and the construct of interest, and (2) *generalizability* evidence related to the stability of ratings across raters and cases.

Because it is both high-stakes and relatively new to the USMLE sequence, potential validity evidence for the scores from the Step 2 Clinical Skills Examination has been a matter of considerable interest. In a recent study, Clauser and colleagues[4] showed that lack of rater consistency made a substantially greater contribution to measurement error in the documentation scores than the other sources of variance included in the study. One potential explanation for the low generalizability of documentation scores is that raters were not using the full score scale appropriately. Indeed, central tendency and restriction of range are two of the most commonly reported rater biases found in scores based on expert judgment.[5] These findings led to an extensive research effort designed to improve the scoring rubrics for the documentation scores. The results of

-45-

Case 5:16-cv-00952-JGB-SP   Document 9-1   Filed 06/28/16   Page 23 of 25   Page ID #:145

# The Relationship Between USMLE Step 2 CS Communication and Interpersonal Skills (CIS) Ratings and the Time Spent by Examinees Interacting With Standardized Patients

Kimberly Swygert, Eric S. Muller, David B. Swanson, and Colette L. Scott

## Abstract

**Background**
During the United States Medical Licensing Examination Step 2 Clinical Skills exam, examinees rotate through 12 standardized patient (SP) encounters. SPs rate examinees on Communication and Interpersonal Skills (CIS). Examinees have at most 15 minutes to interact with each SP, but can end the encounter sooner. The current work assesses the relationship between CIS ratings and time examinees spend interacting with the SP.

**Method**
A total of 5,955 encounters from a fall 2007 sample of examinees were time-stamped to indicate total encounter time and closure time. Hierarchical linear modeling was employed to assess how well total and closure time, in conjunction with other examinee- and SP–case-related variables, predicted CIS scores.

**Results**
Time spent on closure had a larger impact on CIS scores than overall time used. Other variables, such as examinee

gender, Spoken English Proficiency, and SP stringency, were also significantly related to CIS scores.

**Conclusions**
Both time measures were significantly positively related to the CIS outcome variable, indicating a link between time used and SP satisfaction with communication, with closure time having the larger coefficient. This finding suggests that a good closure may be a lengthy one.

*Acad Med. 2009;84(10 Suppl):S1–S4.*

Clear communication between physicians and patients has been shown to be one of the most crucial components of patient satisfaction.[1] Poor communication is a significant predictor of patient complaints and malpractice lawsuits.[2] In particular, physician communication perceived as disrespectful, less focused on the patient, or suggesting the physician is not listening is associated with lower patient satisfaction ratings.[2–4] What is less clear in the literature is the relationship between patient satisfaction and the time the physician spends interacting with the patient. Patients do not like to feel "rushed" during doctor visits, but studies of the relationship between the length of office visits and patient satisfaction surveys have produced inconsistent results.[2,5]

One venue in which the relationship between patient satisfaction with communication and interaction time can be investigated is the clinical skills

performance assessment, where standardized patients (SPs) are used and encounter times and communication skills are measured. The United States Medical Licensing Examination Step 2 Clinical Skills (CS) examination is an example of this type of assessment, and the format of the exam allows for the measurement of both communication skills and the time that examinees spend with SPs.[6]

During CS, examinees demonstrate their skills in a high-fidelity testing situation by interacting as physicians with a series of SPs trained to portray the clinical presentations of real patients. During the test, each examinee interacts with 12 SPs, each of whom portrays a different clinical presentation. During the test, each examinee interacts with 12 SPs, each of whom portrays a different clinical presentation. The summed CIS rating incorporates the SP's judgment of the examinee's questioning skills (e.g., appropriate use of open-ended questions, avoidance of jargon),

information-sharing skills (e.g., providing closure to the encounter, and counseling where appropriate), and general professional manner and rapport.[6]

Examinees are limited to 15 minutes per SP interaction. During this time, an examinee must read the introductory information on the doorway to the examining room, gather a focused history from the SP, and, on most stations, perform a relevant physical exam. Previous research concluded that 15 minutes was sufficient time, and that station format affected time usage.[7] A more recent study expanded on these results by demonstrating that gender and location of medical school of the examinee, as well as the encounter sequence, were related to time used.[8] An underinvestigated research question is whether the amount of time examinees actually spend with SPs affects the SPs' perceptions of communication skills. The present study uses time as a predictor and investigates the extent to which the time used across and within encounters, in addition to other case and examinee characteristics, predicts CIS ratings. Results, if generalizable to physician

Two components that SPs rate for each encounter are Spoken English Proficiency (SEP), a nine-point scale assessing clarity of the examinee's spoken English, and Communication and Interpersonal Skills (CIS), which is three nine-point subscales summed into a single rating ranging from 3 to 27. The summed CIS rating incorporates the SP's judgment of the examinee's questioning skills (e.g., appropriate use of open-ended questions, avoidance of jargon),

Correspondence: Kimberly Swygert, PhD, NBME, 3750 Market Street, Philadelphia, PA, 19104; e-mail: (kswygert@nbme.org).

S1

- 46 -

T5

Article

# Enhancement of the Assessment of Physician–Patient Communication Skills in the United States Medical Licensing Examination

Ruth B. Hoppe, MD, Ann M. King, Kathleen M. Mazor, EdD,
Gail E. Furman, PhD, Penelope Wick-Garcia, Heather Corcoran–Ponisciak, PhD,
and Peter J. Katsufrakis, MD, MBA

## Abstract

The National Board of Medical Examiners (NBME) reviewed all components of the United States Medical Licensing Examination as part of a strategic planning activity. One recommendation generated from the review called for enhancements of the communication skills component of the Step 2 Clinical Skills (Step 2 CS) examination. To address this recommendation, the NBME created a multidisciplinary team that comprised experts in communication content, communication measurement, and implementation of standardized patient (SP)-based examinations. From 2007 through 2012, the team reviewed literature in physician–patient communication, examined performance characteristics of the Step 2 CS exam, observed case development and quality assurance processes, interviewed SPs and their trainers, and reviewed video recordings of examinee–SP interactions. The authors describe perspectives gained by their team from the review process and outline the resulting enhancements to the Step 2 CS exam, some of which were rolled out in June 2012.

As part of a strategic planning initiative, the National Board of Medical Examiners (NBME) recently reviewed all components of the United States Medical Licensing Examination (USMLE). The

**Dr. Hoppe** is professor emeritus, Department of Medicine, College of Human Medicine, Michigan State University, East Lansing, Michigan, and senior consultant, National Board of Medical Examiners, Philadelphia, Pennsylvania.

**Ms. King** is senior assessment scientist, National Board of Medical Examiners, Philadelphia, Pennsylvania.

**Dr. Mazor** is professor of medicine, University of Massachusetts Medical School, Worcester, Massachusetts, assistant director, Meyers Primary Care Institute, and consultant, National Board of Medical Examiners, Philadelphia, Pennsylvania.

**Dr. Furman** is director of educational design and development, Clinical Skills Evaluation Collaboration, National Board of Medical Examiners, Philadelphia, Pennsylvania.

**Ms. Wick-Garcia** is training specialist, Clinical Skills Evaluation Collaboration, National Board of Medical Examiners, Philadelphia, Pennsylvania.

**Dr. Corcoran-Ponisciak** is research measurement analyst, National Board of Medical Examiners, Philadelphia, Pennsylvania.

**Dr. Katsufrakis** is senior vice president of assessment programs, National Board of Medical Examiners, Philadelphia, Pennsylvania.

Correspondence should be addressed to Ms. King, National Board of Medical Examiners, 3750 Market St., Philadelphia, PA 19104; telephone: (215) 590-9661; e-mail: aking@nbme.org.

Acad Med. 2013;88:1670–1675.
First published online September 25, 2013
doi: 10.1097/ACM.0b013e3182a7f75a

USMLE, sponsored by the Federation of State Medical Boards and the NBME, is a three-step examination for medical licensure of U.S. physicians trained at MD-granting institutions here or abroad. One recommendation generated from this comprehensive review was to enhance the communication skills component of the Step 2 Clinical Skills (Step 2 CS) Examination.[1] The Step 2 CS exam assesses communication skills, clinical problem-solving skills, and spoken English proficiency. It uses simulated medical encounters and standardized patients (SPs), who both portray the case and record the examinee's performance. This Step 2 CS component, added to the USMLE sequence in 2004, was a manifestation of a long-standing commitment to assess performance of basic clinical skills.

To address the request for enhancements of the Step 2 CS exam, the NBME created a multidisciplinary team that comprised experts in communication content, communication measurement, and implementation of SP-based examinations. Four of our team members (A.K., G.F., P.W., and H.C.) are NBME employees and are routinely involved in processes involving the Step 2 CS exam (test development, SP training, measurement, and quality assurance activities). Therefore, we bring considerable working knowledge and experience to the tasks of review. Two

external consultants (R.H. and K.M.) with backgrounds in physician–patient communication and measurement completed our team.

In 2007, we began by reviewing literature published since 2001 in physician–patient communication and patient-centered communication. We followed this with focus group discussions at several national meetings of communications skills teachers and researchers. We also held meetings with 14 teachers and scholars in the field of physician–patient communication to explore and update the concepts that had emerged in the literature review.

We also used parts of a survey of first-year postgraduate trainees.[2] This paper-and-pencil survey, developed by the NBME as part of a review of the USMLE to identify new residents' clinical responsibilities, was distributed to 8,793 first-year residents in September 2009, in the early months of their training. This yielded 2,523 surveys for analysis. The survey asked the residents about the frequency of and level of supervision for various clinical activities, including patient care, system-based practice, professionalism, and—of interest to us—communication skills.

Concurrently, we examined performance characteristics of the Step 2 CS exam, observed case development and quality

– 47 –

Article

assurance processes, interviewed SPs, their trainers, and reviewed over 150 video recordings, randomly selected, of examinee–SP interactions administered from 2006 through 2010. This review was exempt from institutional review board inspection because the examinees, when registering for the Step 2 CS exam, gave written permission for their recordings to be used, and the videos contained no individual examinee identification. We did not review videos of examinees who did not give permission (less than 1% of all examinees).

Following this multifaceted review, we explored options for enhancing each of the key elements of the assessment of communication skills within the Step 2 CS exam: the construct, the cases, the instrument, and the SPs. In this article, we share the perspectives we gained and outline the resulting enhancements, some of which were rolled out in June 2012 and others of which will be rolled out in the near future.

Our review produced observations in four categories: (1) defining what is to be assessed (construct), (2) producing the array of cases and examinee tasks (stimulus), (3) capturing the examinee's performance (instrument), and (4) managing the SPs, who both portray the cases and record the examinee's performance (SP management). These observations, in turn, stimulated recommendations for enhancements. We discuss the observations and recommendations for enhancements within each of these categories below.

## Construct: What Is Being Assessed

### Evolution of our understanding

Research strongly supports the importance of communication skills within medical encounters; a growing body of evidence links good communication to desirable clinical outcomes, including adherence, recall, some biologic markers (such as blood pressure), and increased illness-coping skills.[3–7] As the importance of physician–patient communication has grown clearer, so too have calls for more patient-centered communication in medical encounters. In 2001 the Institute of Medicine recommended that care become responsive to patients' needs and perspectives and

that patients' values guide decision making.[8] Although definitions of patient-centered communication vary, there are core components: eliciting and understanding the patient's perspective (concerns, ideas, expectations, needs, feelings, and functioning), understanding the patient within his or her unique psychosocial context, and reaching a shared understanding of the problem and its treatment that is concordant with the patient's values.[9]

These components have stimulated the development of several conceptual communication frameworks, frameworks that significantly expand the communication tasks to be accomplished within medical encounters.[10–14] Whereas physicians previously focused primarily on gathering information, they must now also build relationships, provide information, manage emotions, share the making of decisions, and encourage patients to change behaviors.

### NBME findings

Data collected in the 2009 survey of first-year postgraduate trainees suggest that this expanded list of essential communication tasks applies to residents soon after they begin their training.[2] In general, the survey findings indicated that, unlike the supervised communication they had practiced in medical school, new first-year postgraduate trainees frequently conducted a wide range of communication tasks without direct supervision, some of which they found particularly stressful and challenging, such as delivering bad news and managing hostile patients.

Our review of video recordings from the Step 2 CS exam revealed that examinees tended to focus on gathering information. With some clear exceptions, examinees used highly doctor-centered techniques, extracting medical data from patients with multiple, closed-ended questions, apparently neglecting relationship building and other more empathic and patient-centered behaviors. They rarely used patient-centered techniques to elicit the patient's experience of illness, understand the patient as a whole person, or establish common ground.

One explanation for the highly interrogatory behavior may be that

examinees focus on the other assessment construct embedded in the Step 2 CS exam, that of testing their diagnostic and clinical reasoning skills. Examinees may not adequately perceive or respond to the fact that these simulated encounters have two crucial, simultaneous, and mutually reinforcing purposes—that is, to assess the ability to both solve clinical problems, and to demonstrate understanding of and support for the patient.

### Implications for assessment

In response to the literature review, the survey, and the video observations, we adopted a six-function model as the foundation for an enhanced construct (see Table 1). This model represents a synthesis and modification of the core elements of current dominant models.[10,12] For each function, we identified behaviors that are both patient-centered and have evidence of effectiveness. By focusing on behaviors that seemed most relevant for first-year postgraduate trainees working under supervision, we divided the model into *basic* communication behaviors, included in the June 2012 rollout, and more *advanced* behaviors, which will emerge in later USMLE enhancements. Information about the basic behaviors is available in Table 1 and on the USMLE Web site.[15]

## Stimulus: Case Development and Other Components

### All cases are not alike

The assessment stimulus includes the case underlying the clinical encounter, the SP's portrayal of that case, and the instructions provided to the examinee regarding his or her task or role. In our review of how cases are developed, we noted that biomedical detail dominated both the process and the resulting case. The implicit assumption seemed to be that cases that work well as clinical problem-solving stimuli also successfully stimulate communication tasks. Yet, although cases developed this way do contain some psychosocial and emotional details, they often lack enough detail to elicit the desired set of communication skills. For example, a case might describe a patient with seven children ranging in age from 6 months to 10 years. However, the effect of the child care burden on the patient's presenting problem would typically not be specified in the case materials.

– 48 –